UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: Randall J. House<br>Debtor | Bankruptcy Case No.  05 B 55311<br><br>Chapter 7 |
| Amcore Bank NA,<br>Plaintiff,<br>v.<br>Randall J. House,<br>Defendant. | Adversary No.  06 A 444<br><br>Honorable Manuel Barbosa |

## MEMORANDUM OPINION

This matter is before the Court on an adversary complaint brought by Amcore Bank. N.A. ("Amcore"), represented by Attorney Fred R. Harbecke. The defendant, Randall J. House ("House"), is represented by Attorney Roy Safanda. After an evidentiary hearing was held on February 27, 2007 and the parties submitted proposed findings of fact and conclusions of law on April 23, 2007, this Court took this matter under advisement. For the reasons set forth below, this Court finds the debt owed Amcore is not excepted from discharge.

## JURISDICTION

This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## FINDINGS OF FACT

The debtor, Randall J. House, filed a Chapter 7 bankruptcy petition on October

14, 2005. At that time, House was the sole director, officer and owner of RJH, Inc. ("RJH"), a corporation that investigated fraudulent claims for insurance companies. (Tr. at 70-71.) On the date of the bankruptcy filing, RJH had destroyed the job files and only possessed a few invoices. (Tr. at 80, 81.) The only accounting records consisted of bank statements and tax returns. (Tr. at 82.) The computers contained only e-mail correspondence. (Tr. at 169-70.) After the chapter 7 trustee indicated the estate had no interest in the computers utilized by RJH, House had all of the computer data deleted in order to start with a clean slate. (Tr. at 95; 169.) Shortly thereafter, House created an S Corporation named Innovative Claim Solution that also offered private investigation services. (Tr. at 72.)

At RJH, House was responsible for overseeing about 40 employees,[1] including his brother, and also was the sole signatory on all of RJH's bank accounts. (Tr. at 71, 74-75.) Three secretaries, including House's wife, would assist him with the bookkeeping. (Tr. at 74.) House and his assistants handled the account payables, the account receivable deposits and entered account receivable information into QuickBooks. (Tr. at 75, 77.)

On July 25, 2000, Amcore and RJH entered into The Business Manager Agreement ("BMA"). (Pl. Ex. A.) On that same day, House also personally executed two additional documents: a Guaranty (Pl. Ex. B) and a Security Agreement concerning inventory, equipment, accounts, instruments, documents, chattel paper and other rights to payment and general intangibles. (Pl. Ex. C.) The BMA provides, in part:

---

[1] House testified that RJH utilized both employees and independent contractors. (Tr. at 71.)

2

> The Bank hereby purchases from the Business, and the Business hereby assigns and sells to the Bank, as absolute owner, the Business's entire interest in such of its currently outstanding Receivables as are detailed and attached as Exhibit A to this Agreement, as well as its future Receivables represented by Invoices the Business delivers to the Bank.

(Pl. Ex. A, § 2.1.) "Customer" is defined as a debtor obligated on one or more Receivables which arose from services the Business rendered to the Customer. (Pl. Ex. A, § 1.3.) "Invoice" is defined as an invoice of the terms of a non-cash provision of services previously made by the Business to the Customer. (Pl. Ex. A, § 1.5.)

Mr. Don Miller ("Miller") has been the Senior Vice President and SSA's lending manager at Amcore for the last ten years. (Tr. at 8.) The business manager program is a quasi-factoring agreement whereby Amcore purchased account receivables on a short term basis. (Tr. at 9.) Amcore and RJH's total business transactions amounted to $7 million. (Tr. at 52.) The program required a reserve account that was utilized as additional collateral and provided charge backs for accounts older than 120 days. (Tr. at 11.) Reserves came out of each account receivable, first 10 percent then later 20 percent, and Amcore charged 3.6 to 3.9 percent fees. (Tr. at 14.)

Over time, difficulties arose between RJH and Amcore. Eventually, the arrangement was altered. In January of 2005, Amcore required additional collateral in order to continue to purchase invoices from RJH. (Tr. at 21.) Therefore, House executed a $125,000 second mortgage on the commercial property. (Tr. at 22.) In addition, due to the large amount of aged account receivables that were unable to be charged back, Amcore charged an additional 7.5 percent fees on a monthly basis for accounts over 120 days old. (Tr. at 22, 43.)

On the date House filed the bankruptcy petition the total amount owing to

3

Amcore was $658,808.50. (Tr. at 25-26; Pl. Ex. E.) The reserve account funds totaled $94,895.21. (Tr. at 26.) Amcore received $125,000 from the sale of the property and applied the reserve funds to reduce the outstanding debt to $438,913.29. (Tr. at 27-28.)

## DISCUSSION

Two preliminary issues must be addressed before this Court can reach the merits of the complaint. The first matter to be addressed concerns the failure of Amcore to answer the affirmative defense. House alleged in the answer to the complaint that Amcore failed to mitigate damages by making claims against the insurance policy or did not purchase the insurance but misrepresented its existence. Those allegations are contained under the heading "Affirmative Defense." (Docket #6.) House contends that the failure to answer the affirmative defense results in its admission.

However, the Federal Rules of Bankruptcy Procedure provide otherwise. Bankruptcy Rule of Civil Procedure 7007 adopts Federal Rule of Civil Procedure 7. That rule provides that a party must answer a cross-claim and that the court may order a reply to an answer. FED. R. CIV. P. 7(a). Further, Bankruptcy Rule of Civil Procedure 7008 adopts Federal Rule of Civil Procedure 8 which provides in part: Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied. . . ." FED. R. CIV. P 8(d). Therefore, the pleadings as they stand constitute a denial of House's affirmative defense.

Second, in the Plaintiff's Proposed Findings of Fact and Conclusions of Law Amcore addressed a cause of action not raised in the complaint. (Docket #40). Amcore alleged grounds to deny House a discharge pursuant to 11 U.S.C. § 727(a)(3). The

4

deadline to file objections to discharge expired on April 7, 2006. House received a discharge on April 11, 2006. While Amcore filed this adversary complaint on January 7, 2006, the Complaint does not allege grounds to deny House a discharge, but instead only allegations to except the debt from discharge. Amcore failed to move to amend pursuant to Rule 15, but instead argued additional grounds in the post-trial pleading.

Federal Rule of Civil Procedure 15(b), as made applicable by Federal Rule of Bankruptcy Procedure 7015(b), provides, in relevant part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues.

Rule 7015(b) further provides for amendment and provides that the Court "shall do so freely." However, the Court shall only "when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits." FED. R. BANKR. P. 7015(b). While the Rules provide for amendments by express and implied consent, this Court will not address the merits of this issue *sua sponte*.

### Section 523 Standards

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990). The United States Supreme Court has held that the

5

burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1992). To provide an "honest but unfortunate debtor" with a fresh start, courts will construe exceptions to discharge strictly against a creditor and liberally in favor of the debtor. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

**Section 523(a)(4) - Fraud or Defalcation While Acting as a Fiduciary**

To establish that a debt is non-dischargeable due to defalcation while acting in a fiduciary capacity, the Creditor must establish, by a preponderance of the evidence, the existence of an express trust or fiduciary relation, and a debt caused by the debtor's defalcation while acting as a fiduciary. *Grogan v. Gardner*, 498 U.S. at 291. A threshold inquiry is whether a fiduciary obligation runs from the debtor to the creditor. Whether a debtor was acting in a fiduciary capacity for purposes of § 523(a)(4) is a question of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003.) "An express or technical trust requires an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust." *Smith v. Marcet (In re Marcet)*, 352 B.R. 462, 468 (Bankr. N.D. Ill. 2006.) However, not all fiduciary relationships fall within the discharge exception. The 7th Circuit held that "section 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting discharge, and does not reach 'a trust that has a purely nominal existence until the wrong is committed.'" *Matter of Woldman*, 92 F.3d 546, 547 (7th Cir. 1996) (quoting *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir.1994)).

House admitted that the BMA imposed an express trust upon RJH. (Answer ¶ 9.) This leads Amcore to conclude that House, as the sole shareholder and director, was in a fiduciary relationship with Amcore. As held by the Seventh Circuit, an inequality of power and knowledge must exist in favor of the debtor and against the creditor in order to fall within the discharge exception. Before addressing the necessary requirements to pierce the corporate veil, this Court will determine whether an inequality of power and knowledge existed in favor of House and assume House owed a fiduciary obligation to Amcore pursuant to the BMA.

House was the sole shareholder of RJH, a corporation that employed no more than forty employees. He was the sole shareholder and director. House has a two-year degree in general studies and received an Illinois Private Detective License in 1990. (Tr. at 69.) Amcore, on the other hand, is a banking institution. Miller has a bachelor's degree in business management, a two-year degree in banking and finance and twelve continuing education classes in accounting and cash flow matters. (Tr. at 8.) In addition, he has been a commercial lender for twenty-one years and handled mostly cash flow issues for businesses, lines of credit and borrowing base. (Tr. at 8-9.) The asset lending group that Miller oversees purchases about $10 million a month in accounts receivable. (Tr. at 9.)

The facts present here are akin to the facts of *Marchiano* that resulted in the holding that there must be an inequality of power and knowledge in order for a fiduciary relationship to fall within the discharge exception. In that case, the Court found that although an express trust was created between the owner of a convenience store and the State of Illinois no fiduciary relationship fell within the discharge exception outlined

Case 06-00444 Doc 45 Filed 07/18/07 Entered 07/24/07 09:48:11 Desc Main
Document Page 8 of 13

in § 523(a)(4). Any inequality in power and knowledge was in favor of Amcore, not House. Thus, even assuming that a fiduciary relationship existed between House and Amcore, this Court finds that it did not involve the necessary inequality of power and knowledge required to fall within § 523(a)(4). Therefore, this Court finds that the debt is not excepted from discharge based upon fraud or defalcation while acting within a fiduciary capacity.

### Section 523(a)(4) - Embezzlement and Larceny

Embezzlement under § 523(a)(4) has been defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir.1989) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). To prove embezzlement, the Creditor must show that the debtor appropriated the subject funds for his own benefit and did so with fraudulent intent or deceit. *Weber*, 892 F.2d at 538. A fiduciary relationship or a trust relationship need not be established in order to find a debt nondischargeable by an act of embezzlement. *Id*. Larceny under § 523(a)(4) necessitates a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent. *In re Rose*, 934 F.2d 901, 903 (7th Cir.1991). Embezzlement differs from larceny only in that the original taking was lawful, or at least with the consent of the owner, unlike larceny, where there is a requirement that felonious intent exists at the time of the taking. *Id*.

Both embezzlement and larceny require a fraudulent intent, albeit at different

points in time. Thus, Amcore must demonstrate that House possessed a fraudulent intent in order to prevail on either theory. The critical facts that Amcore relies upon to support its theory include House's failure to tender all monies it received from account receivables to Amcore and the deposit of those funds into two other bank accounts. It is readily apparent that the business relationship between House and Amcore was strained, at best. The critical issuer, however, is whether House fraudulently or deceitfully diverted accounts receivables into the other bank accounts.

Miller and House's understanding of the BMA varies greatly. Miller believes that all of the account receivable belong to Amcore even though not all invoices were purchased from the customer. (Tr. at 10, 43-44.) Thus, the customer handled those accounts, but any receivables collected were to be deposited into the Amcore account. (Tr. at 10.) House reasonably believed that not all payments were required to be submitted to Amcore. House testified that some invoices were handled "outside the program." House's belief that invoices were "outside the program" was based upon Amcore's refusal to purchase certain invoices for insurance reasons and sometimes from a certain customer. Miller explained that certain accounts were "restricted" due to slow payments. (Tr. at 23.) House did not understand the BMA to prohibit him from selling services to those customers. Thus, he continued to do business with those customers "outside the program" and deposited those funds into the other bank accounts. (Tr. at 155.)

While Miller does not understand the BMA to allow for such treatment, the language of section 2.1 provides that the Bank purchased and RJH sold future receivables represented by invoices "delivered to" Amcore. House's explanation for his

belief is both reasonable and credible. House testified that he informed Miller of the practice as early as 2000. (Tr. at 113.) Based upon his belief that some invoices were "outside the program," House would deposit payments on those invoices into the other bank accounts. Miller testified that his staff reviewed documentation received from three clients (Gallagher, Chubb and Jones) and matched invoice numbers noted on checks with those deposited into the Harris Bank and Charter One accounts and with Amcore's records of purchased invoices. (Tr. at 32.) Thus, this Court must determine if House only deposited account receivables he believed were "outside the program" into the Harris Bank and Option One accounts.

Pursuant to the BMA, payments to RJH were to be submitted to a lock box. However, about half of the $7 million paid to Amcore was not sent to the lock box but were instead paid directly to RJH and submitted to Amcore. (Tr. at 144.) According to House, many customers would not send payments in that manner due to the misapplication of payments. Such misapplication caused them accounting errors.

House testified that the accounting practice of Amcore was at odds with the information RJH received. When RJH received an invoice, House would try to sell it to Amcore. RJH would fax approximately 10-14 invoices to Amcore. (Tr. at 141-42.) While invoices were delivered to Amcore, they were not all purchased. Amcore would credit the RJH's bank account but would not specify which invoices it purchased. (Tr. at 142-43.) Many of RJH"s customers had numerous offices and claim numbers. (Tr. at 147.) House received a monthly aged accounts receivable report that listed the customer name and amount but did not detail a case number or claim number. (Tr. at 91, 147.) RJH invoices utilized client claim numbers or case names. (Tr. at 146.)

In addition, Amcore sent audit letters to RJH's clients but would not indicate which agent/office. At least one client threatened to stop doing business with RJH. (Tr. at 148.) Amcore then had RJH review the audit letters to confirm which invoices were collectable. *Id.* House brought the problem to Amcore's attention on numerous occasions and spoke to Kathy Larson at the bank on a daily basis. (Tr. at 147.) House alleges he "asked and pleaded" for a better accounting system that was more focused to the needs of RJH. (Tr. at 92.)

When RJH received funds from customers, House and his staff would look at the file and speak to Amcore in order to determine which account it was. (Tr. at 114.) Customers would also assist by sending RJH copies of the cancelled check. Amcore would often apply funds to a Chubb account, but not differentiate between the forty different Chubb offices. (Tr. at 115.) RJH staff tried to note the invoice number on checks they received before sending them to Amcore in order to facilitate proper credits for its customers. (Tr. at 115-117.) Amcore's accounting practices fall short, at best. The testimony indicates that Amcore and RJH had daily conversations regarding the proper application of payments. Amcore enlisted the help of RJH employees to review and correct the audit letters before they were mailed. In addition, half of the payments Amcore received were sent directly to RJH despite the direction to send them to the lock box. Thus, due to the inaccuracy of Amcore's records, this Court finds that Amcore failed to demonstrate that account receivables purchased by Amcore were diverted into the Harris Bank and Option One accounts.

**Section 523(a)(6)**

Amcore's allegation that House willfully and maliciously injured its property is not supported by the evidence. In order to be entitled to a determination of nondischargeability under 11 U.S.C. § 523(a)(6), Amcore must prove three elements by a preponderance of the evidence: (1) that the Debtor caused an injury; (2) that the Debtor's actions were willful; and (3) that the Debtor's actions were malicious. *French, Kezelis & Kominiarek, P.C. v. Carlson (In re Carlson)*, 224 B.R. 659, 662 (Bankr. N.D. Ill. 1999). Whether an actor behaved wilfully and maliciously is ultimately a question of fact reserved for the trier of fact. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994).

"Willful" means intent to cause injury, not merely the commission of an intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). In order to meet the requirements of § 523(a)(6), a plaintiff must plead and prove that the debtor actually intended to harm him/her and not merely that the debtor acted intentionally, and he/she was thus harmed. *Id.* Injuries either negligently or recklessly inflicted do not come within the scope of § 523(a)(6).

As discussed in the previous section, House had a reasonable belief that not all payments on all of the invoices were required to be tendered to Amcore. Based upon this belief, House deposited funds into the Harris Bank and Charter One accounts. While willful and malicious conduct requires a different showing than fraud, the discussion in the previous section also supports the conclusion that House did not intend to harm Amcore. Thus, this Court finds that there was no fraudulent intent or intent to cause injury to Amcore.

## CONCLUSION

This Court finds that Amcore failed to establish a fiduciary relationship encompassed by § 523(a)(4) because no inequality of knowledge and power existed in favor of House. In addition, Amcore failed to establish that House fraudulently diverted funds pursuant to § 523(a)(4) based upon embezzlement or larceny. Finally, House did not intentionally harm Amcore's property pursuant to § 523(a)(6). Therefore, judgment will enter in favor of House on both counts.

The foregoing constitutes findings of fact and conclusions of law as required by FED. R. CIV. P. 52(a) and FED. R. BANKR. P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.

Signed: July 18, 2007

MANUEL BARBOSA
United States Bankruptcy Judge